UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| RACHEL A. KOPMAN, | ) | Civ.  10-4093-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER DENYING IN PART AND |
| | ) | GRANTING IN PART |
| CITY OF CENTERVILLE and | ) | DEFENDANTS' SUMMARY |
| JAY OSTREM, individually and in | ) | JUDGMENT MOTION |
| his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Rachel A. Kopman, brought suit against defendants, City of Centerville and Jay Ostrem in his individual and official capacities, alleging a hostile work environment and retaliation in violation of 42 U.S.C. § 1983 and SDCL 20-13-10. Kopman seeks compensatory and punitive damages. Defendants move for summary judgment on all of Kopman's claims, which Kopman resists. Defendants' motion is denied in part and granted in part.

**BACKGROUND**

In the light most favorable to Kopman, the nonmoving party, the pertinent facts to this order are as follows:

Centerville is a small town located in Turner County, South Dakota. Centerville is governed by an elected mayor and a six-person elected city council. In 2008, Centerville advertised for a chief of police. Kopman, who at

the time worked for the City of Sioux Falls as a law enforcement officer, applied for the position.

Centerville hired Kopman as its chief of police on June 2, 2008. At that time, Val Fischer was Centerville's mayor and Ostrem was on Centerville's City Council (Council). The Council voted 5-0 to hire Kopman. Ostrem, a former law enforcement officer with 30 years of experience and an investigator with the Turner County sheriff's office, and other Centerville officials declared that Kopman was the most qualified candidate. Ostrem became Centerville's mayor in April of 2009.

In late June of 2008, Ostrem began making comments to Kopman that she felt were sexually inappropriate. These comments continued until about September of 2009.

Ostrem saw Kopman two to three times a week and, when he saw her, he made sexually inappropriate comments to her. Ostrem often commented on Kopman's body. For example, in the first few weeks of her job, Kopman did not have a uniform; instead, she wore a white T-shirt and jeans. Ostrem told Kopman he liked how her "large boobs" looked in her white shirt, how her "butt" or "a**" looked in her jeans, and that he could almost see her panties. Ostrem told Kopman that her hair had a "wild, sexy look," or some similar phrase. He stated that if she batted her eyes, she could get the Council and other men to do whatever she wanted. Ostrem referred to Kopman as the "hot

mama cop" and "hot cop." He commented on how she dressed and, once she received her uniform, often told her that she looked good in her uniform or that she made the uniform look good.

Ostrem also discussed Kopman's boyfriend at the time, Jerry James, with her. Ostrem told her that if he were younger and more attractive then maybe he could be in the position where James was, i.e., dating Kopman. He expressed his desire to date Kopman multiple times if only the circumstances were different.

Some of Ostrem's remarks reflected comments that were being made in Centerville about Kopman. For example, Ostrem heard about Kopman wearing a bikini to the local pool, and he told her that her "hot body" was causing a lot of rumors in Centerville, including that the women hated her and the men wanted to "do" her. Ostrem also told Kopman that she should make up a fiancé and put that story on the front page of the paper to stop the rumors.

Ostrem often asked Kopman to stop by his house to discuss business matters.[1] When she would leave his house, he would walk behind her, leer at her rear end, and make comments about how good her "a**" looked in jeans. Kopman estimated that she visited Ostrem more than once a month at his home.

_____

[1] It is unclear from the record if Kopman visited Ostrem at his home when he was a councilperson, mayor, or both.

3

Ostrem also made comments about Kopman in front of other people, including James. Most of the statements that James heard occurred when James and Kopman stopped at Ostrem's house at Ostrem's request. While James was present, Ostrem told sexual jokes and then commented on or made a sexual joke regarding the size of Kopman's breasts or otherwise commented on her body. He also called Kopman "hot cop" and "mama cop" in front of James. James felt that Ostrem was demeaning women when he made these comments.

Other people also heard Ostrem make comments about Kopman, including Mario Massa, a Turner County sheriff's deputy during the relevant time period. Massa heard Ostrem comment about how hot Kopman was and that he wanted to "bang" her. Matt Wetterling, also a Turner County sheriff's deputy, heard Ostrem comment about Kopman. For example, Ostrem told Wetterling that when Kopman was hired she had the body of a 24-year-old (Kopman was 38 when she was hired) and she would make a good-looking deputy. Wetterling stated that every time Kopman's name would come up, Ostrem would "mention something off-color." Docket 41-11 at 4.[2]

---

[2] For proof of Massa's and Wetterling's comments, Kopman relies on recorded conversations she had with Massa and Wetterling, which defendants argue are inadmissible hearsay and lack foundation. Kopman cured defendants' foundation concerns. Kopman asserts, and defendants do not contest, that she meets the requirements for admissibility of recorded conversations as set forth in *United States v. McMillan*, 508 F.2d 101 (8th Cir. 1974). Massa's and Wetterling's statements describing Ostrem's comments to

Ostrem also made derogatory comments about female police officers to Kopman. For example, Ostrem told Kopman not to act angry because other people would assume she was on her menstrual cycle, and that female police officers only need to look good and do not need to have any knowledge about the job. Ostrem told Kopman that she was doing a "man's job," and that women cannot be successful police officers like men.

Kopman told Ostrem at least six times that his comments made her uncomfortable and that she wanted him to stop making the comments. She told him that his comments were disgusting, wrong, and hurtful, and she hated the statements. Ostrem did not stop making comments. One time, Ostrem told Kopman that she needed to grow thicker skin.

Greg Baker served as a councilperson from 2008 to late 2009 or early 2010. Baker sent Kopman text messages about work. But he also sent her sexually inappropriate text messages. Baker was a councilperson during the entire time that he sent Kopman sexually inappropriate text messages.

Kopman estimated that Baker began sending sexually inappropriate text messages in April of 2009 and he sent her approximately 50-60 such

---

them are admissible at trial as a statement of an opposing party. *See* Fed. R. Evid. 801(d)(2) (reasoning that a statement made by an opposing party and offered against the opposing party is not hearsay). Defendants have raised numerous issues with the evidence upon which Kopman relies in her brief opposing summary judgment. The court only addresses the arguments on the facts necessary to decide this matter.

messages. Some days Kopman did not receive any sexually inappropriate text messages and other days she received more than one message. Kopman estimated that half of Baker's sexually inappropriate text messages were forwarded messages that Baker received from another person.

In one set of messages, which were not forwarded messages, Baker stated that he wanted to see Kopman in a pair of "a**less" chaps and he wanted to see her sexy "a**" on the back of his motorcycle. He followed up on those messages with a verbal comment to Kopman that she was a pretty female and asked her when she was going to go on a motorcycle ride with him. Another time, while Kopman was waiting to give a police department report to the Council during a Council meeting, Baker texted Kopman and asked her how it felt when her phone was vibrating in her pocket. He followed up by asking what her vibrating phone felt like sexually.

Baker also forwarded a number of sexually suggestive text messages to Kopman. He forwarded to her pictures of female genitalia, nude photos of men and women, and photos of a man and a woman having sex in a certain sexual position, such as "doggy style." He would then follow up with a text message asking Kopman if she had tried that position or if she would like to try that position. Kopman felt that, through these text messages, Baker was expressing an interest in having sex with her.

6

Another time, Baker forwarded a picture of tattooed female genitalia to Kopman and asked her what she thought about tattooing female genitalia. James recalled Kopman receiving text messages with pictures of women having sex and a picture of a woman with a bull's eye over her vagina. James recalled seeing these text messages on Kopman's phone months before any concerns were raised by Ostrem or the Council concerning her performance as chief of police.

Kopman initially did not report either Ostrem's or Baker's conduct because she did not want to lose her job. Ostrem told her that he was good at getting rid of people. He boasted to her that he had helped fire two Turner County sheriff's deputies and all he had to do to get someone fired was "plant seeds and watch them grow." Docket 1 at 4.

Centerville maintains a sexual harassment policy that prohibits sexual harassment manifested as a hostile work environment or retaliation. Under the policy, if an employee feels like she has been harassed, she "should immediately report the matter to the immediate supervisor unless the supervisor is the offending party. If the supervisor is unavailable, or the employee believes that it would be inappropriate to contact [the] supervisor, the employee should immediately contact the mayor, council president or a council member." Docket 41-14 at 2.

On September 2, 2009, Kopman complained about Ostrem's and Baker's conduct to Nancy Kludt, who is Centerville's Finance Manager. Kludt also handles Centerville's human resources needs and has received human resources training. Kopman believed that Kludt was a manager or supervisor because she was a financial officer and handled human resources paperwork for Centerville. Kludt did not file a sexual harassment complaint on behalf of Kopman after their September 2 conversation.

On September 2, 2009, Kopman called the Equal Employment Opportunity Commission (EEOC) or the South Dakota Division of Human Rights (SDDHR) to complain about Ostrem and Baker. On that same day, she filed her initial paperwork with the EEOC/SDDHR, which she printed off of the internet. She also contacted the Division of Criminal Investigation (DCI), a department that investigates complaints in police departments. On October 7, 2009, Kopman submitted a formal charge of discrimination with the SDDHR. On February 25, 2010, the SDDHR found that there was probable cause to believe that sexual discrimination or harassment and/or retaliation had occurred against Kopman.

Before September of 2009, Ostrem frequently complimented Kopman on her job as chief of police, particularly on her call coverage. James heard Ostrem frequently compliment Kopman on her performance. Dean Austin, a councilperson, stated that Kopman patrolled about the same amount as her

predecessor. Former mayor Fischer never received any complaints about Kopman; instead, she only received compliments. Kopman specifically recalled receiving compliments from Ostrem during her birthday party on March 14, 2009, and knew that Ostrem continued to compliment her work during the 2009 summer.

On September 18, 2009, Ostrem sent Kopman a letter, not on Centerville letterhead, outlining issues with Kopman's performance as chief of police. Ostrem did not talk with Kopman about the concerns before writing the letter. Ostrem also sent a copy of the letter to every councilperson.

In the letter, Ostrem stated that he did not support the wage increase that Kopman requested in a September 9, 2009, budget meeting, and Kopman's statement to the Council that she would leave if she did not receive the wage increase caused the Council stress. He admonished Kopman to "refrain from referring to the Council Members, and the Mayor, as 'two face,' 'back stabbers,' and 'a** holes.' You will refrain from making statements that someone is 'suicidal,' 'beats their wife,' and 'beats their kids,' just because they don't support your budget." Docket 31-7 at 5.

Ostrem also stated that Kopman incorrectly handled a domestic assault on September 13, 2009, because she allegedly did not submit paperwork in a timely manner. He also admonished Kopman to update her timecard by the

9

end of each day, to use the police radio whenever practical, and to keep the Turner County sheriff's dispatch appraised of her status.

Kopman responded to the September 18 letter in an undated letter, received by Centerville on September 21. Kopman believed that the September 18 letter was a reprimand or a threat of a reprimand and requested a grievance hearing.

In a September 22, 2009, letter to the Council, Ostrem stated that he was attaching a letter from Centerville's attorney, Greg Brewers, about complaints made by the Turner County state's attorney Tiffani Landeen-Hoeke. Landeen-Hoeke had not complained about Kopman's performance until Ostrem contacted her to inquire about Kopman's performance as chief of police. In the September 22 letter, Ostrem also stated that he participated in a conference call with Turner County sheriff Byron Nogelmeier and dispatcher Todd Baldwin. Nogelmeier and Baldwin allegedly told Ostrem that they had had difficulties with Kopman answering calls. Ostrem gave every councilperson a copy of the letter.

In a letter dated September 23, 2009, Brewers informed Kopman that the September 18 letter was "actually more of a cautionary statement than a reprimand." Docket 41-12 at 2. Nevertheless, Brewers told Kopman that a grievance hearing would be held on October 5, 2009, the next regularly-scheduled Council meeting.

10

After Brewers scheduled the October 5 grievance meeting, Ostrem called a special Council meeting on September 30, 2009, to discuss concerns about Kopman's performance.

Kopman retained attorney Bill Janklow. On September 28, 2009, Brewers informed Janklow about the September 30 meeting. That same day, Kopman notified Centerville that because Janklow would be unable to attend the meeting, she would not be there. The Council held the meeting as planned.

During the September 30 meeting, which Ostrem and Baker attended and Ostrem led, Ostrem relayed that Nogelmeier and Baldwin had allegedly expressed concerns to Ostrem about Kopman's deficient call coverage. Neither Nogelmeier nor Baldwin testified about Kopman's call coverage; instead, the Council's only information about Kopman's call coverage was relayed through Ostrem in his September 22 letter and during the September 30 meeting.[3]

Landeen-Hoeke spoke during the September 30 special session. Landeen-Hoeke told the Council that Kopman was late with paperwork one time for a domestic abuse incident and had been rude to her assistant. In her affidavit, Landeen-Hoeke relayed three other concerns she had with Kopman, but she did not advocate for Kopman's termination.

---

[3] Kopman claims that the radio in her police car did not always work. Instead, she took phone calls for Centerville on her personal cell phone, which Centerville listed on its website. Thus, Kopman did not often receive dispatch calls from the Turner County sheriff's office.

11

Ostrem reported to the Council that he received complaints from citizens about the amount of time Kopman spent patrolling. The only citizen from whom Ostrem recalled receiving a complaint was Dawn Murra, the wife of Mike Murra, a councilperson. Dawn Murra did not testify before the Council.

The Council voted 5-0 to suspend Kopman without pay until her October 5 grievance meeting. The Council determined that Kopman had violated various sections of policy number nine in Centerville's Personnel Manual.

In a letter dated October 14, 2009, Brewers informed Janklow that Centerville would be unable to settle Kopman's harassment claim. Brewers also stated that the grievance hearing would be held on October 19, 2009. Kopman was unable to attend the October 19 grievance meeting and asked for a continuance. Centerville rescheduled the grievance hearing for November 2, 2009, and Brewers stated that this would be the last continuance. Brewers also notified Janklow that Centerville was considering termination or suspension of Kopman at the November 2, 2009, meeting. Kopman continued to be suspended without pay.

Even though Kopman did not attend the October 19 meeting, the Council heard testimony from two residents, Deb Otto and Charles Fritts. Otto told the Council that Kopman was tanning at a tanning salon while on duty but provided no date(s) for the alleged incident(s). No one followed up with the

12

tanning salon's owner to substantiate the claims. Kopman contends that she was called to the tanning salon because of complaints about dogs in the alleyway. Fritts complained about a lack of patrol and provided no other testimony on what he meant by stating that Kopman's patrol car was not out enough. No one substantiated Fritts's complaints. At the end of the meeting, Ostrem presented Kopman's formal charge of discrimination from the SDDHR to the Council. The Council voted to continue Kopman's suspension without pay.

Neither Kopman nor Janklow attended the November 2, 2009, meeting. The Council voted to terminate Kopman. Ostrem withdrew the appointment of Kopman as chief of police. About a month after the Council voted to terminate Kopman, Baker resigned from the Council.

No investigation was conducted into the allegations regarding Baker's conduct. Ostrem and Brewers conducted the investigation into Kopman's sexual harassment complaints against Ostrem. Ostrem reported to the Council that nothing had happened. Brewers never addressed the Council on the investigation's outcome. During his deposition, Austin testified that he still does not know what occurred between Ostrem and Kopman.

During a November 14, 2009, conversation between Kopman, Austin, and Dave Parmley, Austin told Kopman that Ostrem told the Council that the issues with Kopman went from "housecleaning" to a "witch hunt." Docket 41-

10 at 2.[4] Austin stated that Ostrem bragged to the Council that he could handle the negative publicity in the media about Kopman's harassment lawsuit. Ostrem and Brewers laughed about Ostrem's statements to the media and thought it was funny that Ostrem made Kopman look bad. He also told the Council that "you don't f*** the help." Docket 41-10 at 13.

The Council believed that Centerville's errors and omissions insurance policy would cover any damages imposed against Centerville from Kopman's lawsuit. Ostrem, however, told the Council that the policy would not cover the lawsuit. Instead, he told the Council that Kopman would be able to get at their homes, cars, pickups, and "extracurricular activities," such as snowmobiles and lawnmowers.

After she was terminated, Kopman had to move out of her Centerville home. Kopman and her two daughters were essentially homeless and lived with friends. Kopman took medication for depression, anxiety, and suffered from a lack of sleep for a few months. Kopman slept only one to three hours a night immediately following her termination because she was stressed and worried about how she would pay the bills and buy groceries for her and her

---

[4] For proof of Ostrem's comments to the Council, Kopman relies on a recorded conversation with Austin and Parmely, which defendants argue is inadmissible evidence. As stated earlier, Kopman has met the *McMillan* test for recorded conversations. As a party-opponent, Ostrem's statements made to the Council would be admissible at trial. *See* Fed. R. Evid. 801(d)(2) (stating that a statement made by an opposing party and offered against the opposing party is not hearsay).

14

children and how she was going to find a job because Ostrem had smeared her name. Because Kopman was unable to find a job in South Dakota, she moved to Vancouver, Washington, where she currently lives and works.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Only disputes over facts that might affect the outcome of the case will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court views the facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal citation omitted). The nonmoving party also receives "the benefit of all reasonable inferences to be drawn from the underlying facts" in the record. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

15

**DISCUSSION**

I.   **Hostile Work Environment Claims**

Kopman alleges a § 1983 violation of her Fourteenth Amendment right to be free from a hostile work environment against Ostrem in his individual and official capacities and against Centerville. Kopman also alleges a hostile work environment claim under SDCL 20-13-10 against Ostrem and Centerville.

   A.   **Section 1983 Claims**

      1.   **Individual Capacity Claim Against Ostrem**

Section 1983 provides a civil cause of action against any person who, under color of state law, causes a deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States. 42 U.S.C. § 1983; *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009).

In an individual capacity suit under § 1983, a plaintiff seeks to impose personal liability on a state actor for actions taken under color of state law. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978). Only state actors whose personal conduct caused the deprivation of a federal right are liable under § 1983. *Pulaski Cnty. Republican Comm. v. Pulaski Cnty. Bd. of Election Comm'rs.*, 956 F.2d 172, 174 (8th Cir. 1992) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

16

When a municipal actor is sued in his individual capacity, he can plead an affirmative defense of qualified immunity. *Murray v. City of Sioux Falls*, 867 F.2d 472, 476 (8th Cir. 1989). "Individual defendants are entitled to qualified immunity unless their alleged conduct violated 'clearly established statutory or constitutional rights of which a reasonable person [in his position] would have known.' " *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

To overcome a defense of qualified immunity, the court conducts a two-step inquiry: " '(1) [whether] the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) [whether] the right was clearly established at the time of the deprivation.' " *Jones v. McNeese*, 675 F.3d1158, 1161 (8th Cir. 2012) (alterations in original) (quoting *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010)). The court has the discretion to choose which prong to analyze first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 241 (2009)).

Under the second prong, a plaintiff must show that the law was clearly established at the time of the alleged constitutional violation. *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) ("Although the defendant bears the burden of proof for this affirmative defense, the plaintiff must demonstrate that the law was clearly established." (citing *Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002))). " '[C]learly established' means '[t]he contours of the right

17

must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Jones*, 675 F.3d at 1161 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The decisive fact in the clearly established analysis is not whether the municipal actor's position turned out to be incorrect, but rather was the question open at the time he acted. *Mitchell v. Forsyth*, 472 U.S. 511, 535 (1985).

If Kopman can prove that the law was clearly established, Ostrem must then show that he acted reasonably in accordance with the clearly established law. *Monroe*, 495 F.3d at 594. This issue revolves around a standard of objective reasonableness because "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (quotations omitted); *see also Riehm v. Engelking*, 538 F.3d 952, 962 (8th Cir. 2008) ("Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))).

Accordingly, the question is "whether a reasonable [mayor or councilperson] could have believed [his actions] to be lawful, in light of clearly established law and the information [he] possessed. [His] subjective beliefs about the [conduct] are irrelevant." *Anderson*, 483 U.S. at 641. This is a case-by-case determination. " 'This second step is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad

18

general proposition.' " *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 459 (8th Cir. 2011) (quoting *Seymour v. City of Des Moines*, 519 F.3d 790, 798 (8th Cir. 2008)).

"Sexual harassment by state actors violates the Fourteenth Amendment and establishes a section 1983 action." *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003) (citing *Moring v. Ark. Dep't of Corr.*, 243 F.3d 452, 455 (8th Cir. 2001)). Section 1983 and Title VII require an employee to make the same four-part showing for a hostile work environment claim: (1) the employee belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of her employment. *Id.* (citing *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 933 (8th Cir. 2002)). Defendants only challenge the fourth element of the hostile work environment claim. Docket 42 at 5.

For sexual harassment to sufficiently affect a term, condition, or privilege of employment, the " 'sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.' " *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 631 (8th Cir. 2000) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

On the objective prong, the fact-finder views the facts from the totality of the circumstances, *Faragher*, 524 U.S. at 787-88, because "[a] hostile work

19

environment is a cumulative phenomenon composed of 'a series of separate acts that collectively constitute one unlawful employment practice.' " *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1125 (8th Cir. 2007) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)). "Sexual harassment 'standards are demanding—to be actionable, conduct must be extreme and not merely rude or unpleasant.' " *Tuggle*, 348 F.3d at 720 (quoting *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003)). " 'More than a few isolated incidents are required,' and the alleged harassment must be 'so intimidating, offensive, or hostile that it poisoned the work environment.' " *Id.* (quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999)). In making this determination, the court considers factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S.17, 23 (1993).

Because Ostrem can only be liable in his individual capacity for his conduct, the court will first consider whether Ostrem's conduct rises to the hostile work environment threshold.

Kopman subjectively found Ostrem's conduct to be unwelcome harassment and told him at least six times that his comments were

20

disgusting, wrong, and hurtful. Ostrem does not contest that Kopman found his behavior to be subjectively offensive.

On the objective prong, Ostrem began sexually harassing Kopman in late June of 2008 and continued to harass her after he became mayor in April of 2009. The harassment did not cease until late summer of 2009. Ostrem made comments to Kopman almost every time he saw her, which was about two or three times a week. Two to three comments a week for 14 months is very frequent sexual harassment.

The conduct was also severe because it was blatantly directed at Kopman's body, including comments about the size of Kopman's breasts, her "hot body," her making the uniform look good, and her hair having a "wild, sexy look." Ostrem told Kopman that he wanted to trade places with James and, if the circumstances were different, he would date her. Ostrem constantly called Kopman "hot mama cop" and "hot cop." When she would go to Ostrem's house at his request, he would follow behind her, leer at her rear end, and make comments about how good her "a**" looked in jeans. This occurred at least once a month. At the same time, Ostrem also made derogatory comments about female police officers to Kopman, including comments about Kopman's menstrual cycle, that Kopman was doing a "man's job," and that female police officers only had to look good and were not as good as male police officers.

Kopman found Ostrem's conduct humiliating, especially when he made comments in front of James and her coworkers. Ostrem worked for the Turner County sheriff's office as an investigator. While at the sheriff's office, Ostrem told Massa that he wanted to "bang" Kopman. Massa stated that whenever Kopman's name would come up, Ostrem would "mention something off-color." Wetterling also recalled Ostrem making comments about Kopman, including a comment when she was first hired that Kopman had the body of a 24-year-old. Kopman had to work with the Turner County sheriff's office because she occasionally took calls from the sheriff's office as part of her duties as Centerville's chief of police.

"Harassment need not be so extreme that it produces tangible effects on job performance or psychological well-being to be actionable." *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999) (citing *Harris*, 510 U.S. at 22). Here, Ostrem made sexually inappropriate comments to Kopman two to three times a week for over 14 months. Kopman endured " 'a steady barrage of opprobrious [discriminatory] comment[s],' " which is sufficient to show that Ostrem's sexual harassment affected a term or condition of her employment. *Ways v. City of Lincoln*, 871 F.2d 750, 754 (8th Cir. 1989) (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981)).

Courts have found that frequent sexually inappropriate comments can create a hostile work environment. *See, e.g.*, *Sheriff v. Midwest Health Partners,*

*P.C.*, 619 F.3d 923, 930 (8th Cir. 2010) (upholding a jury's award of damages in a hostile work environment case and reasoning that "[t]he whole pattern of conduct must be examined, for its severity and pervasiveness cannot be fully understood by carving it into a series of discrete incidents." (quotations omitted)); *E.E.O.C. v. Wyeth*, 302 F. Supp. 2d 1041, 1064 (N.D. Iowa 2004) (denying summary judgment when the harasser made comments immediately after the female employee started work and continued to make comments every time he saw her); *Hanna v. Boys & Girls Home & Family Servs., Inc.*, 212 F. Supp. 2d 1049, 1062 (N.D. Iowa 2002) (denying summary judgment and finding that the plaintiff "has shown that [the] conduct . . . altered her daily work environment and caused her humiliation and intimidation that occurred both in the presence of co-workers and clients." (citation omitted)); *cf. Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 845-46 (8th Cir. 2006) (reasoning that " 'ordinary tribulations in the workplace, such as the sporadic use of abusive language, gender-related jokes, and the occasional teasing' obtain[s] no remedy." (quoting *Faragher*, 524 U.S. at 788)); *Jones v. Forrest City Grocery Inc.*, No. 4:06-cv-00944, 2008 WL 2717738, at *4 (E.D. Ark. June 26, 2008) ("If the comments are sporadic or casual, they are unlikely to establish a hostile work environment." (citation omitted)).

Ostrem's conduct was continuous, and it permeated and poisoned Kopman's work environment. Thus, Kopman has met her burden to show that

Ostrem deprived her of her constitutional right to be free from a hostile work environment.

Ostrem must now show that a reasonable person in his position (as a councilperson and then as a mayor) could have believed that his conduct did not affect a term, condition, or privilege of Kopman's employment. As a councilperson and mayor, Ostrem was one of Kopman's supervisors. Kopman reported her work performance to the Council at its meetings. The Council had the power to terminate Kopman's employment. As mayor, Ostrem could recommend to the Council that Kopman be fired and call special sessions to discuss her performance, as he did when he called the September 30 special session. He also had the ability to withdraw Kopman's appointment as chief of police with the Council's approval. Ostrem worked as an investigator at the Turner County sheriff's office and was heavily involved in Kopman's work as Centerville's chief of police. Kopman reported to Ostrem about her work in Centerville and frequently met with Ostrem at his home when requested.

Kopman repeatedly told Ostrem to stop making the comments. He did not stop making the comments and, on one occasion, told Kopman to grow thicker skin. Ostrem often told Kopman that if he wanted to get someone fired, all he had to do was "plant the seed and watch it grow." He boasted that he had gotten people fired in the past, including two deputies at the Turner County sheriff's office. Kopman felt that Ostrem made these comments to her

24

to prevent her from reporting his conduct. Threatening to fire someone because she reports sexually discriminatory behavior affects a condition, term, or privilege of employment because Kopman either had to "put up with" Ostrem's conduct or lose her job. *See, e.g.*, *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 616-17 (8th Cir. 2000) (upholding a jury verdict on a hostile work environment claim when the employee was threatened with termination for reporting a coworker's sexual harassment).

Ostrem, citing various cases, argues that his conduct does not rise to the demanding standard for a hostile work environment. But all of Ostrem's cases are distinguishable because in those cases the defendants' conduct was not as frequent as Ostrem's conduct and the plaintiff was not threatened with losing her job if she reported the conduct.[5]

Given these facts, Ostrem has not met his burden to prove that a reasonable councilperson or mayor would have believed that making sexually

---

[5] *See, e.g.*, *Anderson v. Family Dollar Stores of Ark., Inc.*, 579 F.3d 858, 862 (8th Cir. 2009) (reasoning that six sexually inappropriate incidents were insufficient to make a hostile work environment claim); *LeGrand v. Area Resources for Cmty. & Human Servs.*, 394 F.3d 1098, 1100, 1102 (8th Cir. 2005) (reasoning that three incidents of sexual harassment were insufficient to make out the fourth element of the hostile work environment claim); *Duncan*, 300 F.3d at 933, 936 (reasoning that ten incidents of sexually inappropriate behavior was insufficient for the behavior to have affected a term or condition of plaintiff's employment). Here, the conduct was not three, six, or ten incidents. Ostrem made sexually inappropriate comments to Kopman two to three times a week for 14 months, and Ostrem threatened to fire Kopman if she reported his conduct.

inappropriate comments to the chief of police for 14 months and threatening to fire her if she reported his conduct was lawful.

Furthermore, the hostile work environment cases cited previously were all decided before the events at issue here occurred. Thus, the law regarding Kopman's right to be free from a hostile work environment was clearly established before the events at issue here occurred. Because Kopman has overcome both prongs of the qualified immunity defense, defendants' motion for summary judgment as to Ostrem's individual liability under § 1983 for Kopman's hostile work environment claim is denied.

### 2.   Official Liability Claim Against Centerville and Ostrem

In addition to the evidence previously discussed regarding Ostrem's actions, Kopman alleges that Baker also harassed her. Regarding Baker's conduct, the parties agree that the first three elements of the hostile work environment test are met, but defendants dispute that the fourth element is met.

Kopman subjectively found Baker's 50-60 text messages and verbal "follow up" comments unwelcome. Baker argues that Kopman could not have found his text messages too unwelcome because she continued to socialize with him during the relevant time period. Centerville is a small town and Baker was one of Kopman's supervisors. The fact that she continued to socialize with him does not mean that she did not find his conduct

subjectively unwelcome. Moreover, after Baker began sexually harassing Kopman, she avoided being alone with him. She also told him at least six times to stop his behavior. Accordingly, she has alleged enough facts to show that she found his behavior subjectively unwelcome.

Under the objective prong, the frequency of Baker's conduct is high because over a four-to-five month time-span, Kopman received approximately 50-60 sexually inappropriate text messages from him. The severity is also high because the text messages contained sexually inappropriate messages and nude, sexual pictures. In one series of text messages, Baker told Kopman he wanted to see her in a pair of "a**less" chaps and that he wanted to see her sexy "a**" on the back of his motorcycle. He followed up on these text messages by verbally telling Kopman that she was a pretty female and asking her if she wanted to go on a motorcycle ride with him.

Another time, Kopman was waiting during a Council meeting to give her police report. Baker texted her to ask how it felt to have her phone vibrating in her pocket. He followed up by texting her and asking her what her vibrating phone would feel like sexually.

The remainder of the 50-60 text messages were forwarded messages with pictures of nude women, female genitalia, and men and women engaged in sex. For example, at least one message contained pictures of tattooed female genitalia. Baker followed up by asking Kopman what she thought of

27

tattooing female genitalia. He also sent her a picture of a woman with a bull's eye over her vagina. Some of the forwarded messages were pictures of men and women engaged in certain sexual positions. Baker would follow up these text messages by asking Kopman if she would like to try that position or if she had ever tried that position in the past.

Courts have found that sexually graphic or explicit pictures can create a hostile work environment. *See, e.g.*, *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (en banc) (reasoning that "a reasonable jury could find that, taken together, the various mannequin incidents, the vulgar song and picture, and the graphic descriptions of sexual activity (especially oral sex) that consistently painted women in a sexually subservient and demeaning light were sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and to create an abusive work environment."); *Urofsky v. Gilmore*, 216 F.3d 401, 431 (4th Cir. 2000) (reasoning that " 'graphic images of a nude woman in chains, a nude man with an erection, and a man and woman engaged in anal intercourse' " could contribute "to a hostile work environment" (quoting *Urofsky v. Allen*, 995 F. Supp. 634, 639 (E.D. Va. 1998))); *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 319 (2d Cir. 1999) (holding that the employee met her burden for showing a hostile work environment when she was exposed to lewd pictures every working day); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1479 (3d Cir. 1990) (finding

the supervisor liable for, among other actions, permitting employees to display excessively lewd pictures); *E.E.O.C. v. Int'l Profit Assocs., Inc.*, 654 F. Supp. 2d 767, 817-18 (N.D. Ill. 2009) (finding that, among other actions, the viewing of sexually explicit pictures of people engaging in oral and anal sex by men in the workplace made for a hostile work environment for a female employee).

Baker's conduct permeated and poisoned Kopman's working environment. She was confronted with sexually inappropriate pictures and sexually suggestive comments by Baker on an almost daily basis for four months. Thus, his conduct affected a term or condition of Kopman's employment.

Defendants argue that Ostrem in his official capacity and Centerville cannot be liable for the conduct of Ostrem and Baker because Kopman has not alleged an unconstitutional policy or custom of discriminatory conduct. A plaintiff usually needs to show that the alleged constitutional violation resulted from an unconstitutional policy or a practice or custom of discriminatory behavior in order to hold the municipality or government official in his official capacity liable. *See, e.g.*, *Monell*, 436 U.S. at 690-91.

But such a showing is unnecessary when the government official who allegedly violated the plaintiff's rights is in a policy-making position. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986). "Claims against a municipality based on the acts of an individual officer or entity instead of a

29

written policy or code have succeeded in circumstances where the action was not 'subject to significant review' because the officer was in a 'policy making position . . . represent[ing] the official policy of the municipality." *Granda v. City of St. Louis*, 472 F.3d 565, 568 (8th Cir. 2007) (second alteration in original) (quoting *McGautha v. Jackson Cnty., Mo., Collections Dep't*, 36 F.3d 53, 56 (8th Cir. 1994)). "A governmental subdivision can face liability under § 1983 for the final policy decisions of officials in managerial or executive offices[.]" *Id.* (citations omitted).

" '[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury [then] the government as an entity is responsible under § 1983.' " *Hollins v. Powell*, 773 F.2d 191, 194 (8th Cir. 1985) (quoting *Monell*, 436 U.S. at 694). "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)). "[W]hether an official ha[s] policymaking authority is a question of state law." *Id.* at 481.

It appears that Centerville follows the aldermanic-form of municipal government.[6] In this form of government, the mayor presides over the city council meetings and recommends measures "as he may deem expedient," but he does not vote unless there is a tie. SDCL 9-8-3. The mayor can veto any ordinance or resolution that the council passes. SDCL 9-8-3. The majority of the council votes to hire a city officer, such as chief of police, and the mayor approves that vote. SDCL 9-14-3; *see also* Docket 41-13 (summarizing Centerville's policy on appointing officials). The council holds regular meetings, and the mayor can call special meetings. SDCL 9-9-12.

As councilpersons, Ostrem and Baker had the power to present issues with Kopman's performance to the Council and to vote regarding termination of her employment. Because the Council has the authority under South Dakota law to pass and enforce the laws and hire and fire city officials, Baker and Ostrem, while serving as councilpersons, were in policymaking positions.

Furthermore, as Kopman's supervisors, Ostrem and Baker had to comply with Centerville's sexual harassment policy, which prohibits harassment that creates a hostile work environment. Docket 41-14 at 1 ("Unwelcome sexual advances . . . and other verbal or physical conduct of a

---

[6] In their statement of the facts, defendants cite to SDCL 9-14-13 to explain how the Council voted to terminate Kopman's employment and then Ostrem withdrew Kopman's appointment as chief of police. Docket 29 ¶ 12. SDCL 9-14-13 provides "[i]n an aldermanic-governed first and second class municipality . . . ."

sexual nature constitutes sexual harassment when . . . [the conduct] has the purpose or effect . . . of creating a hostile, intimidating, or offensive employment environment[.]"). Kopman complained directly to Ostrem and Baker and asked them to stop their behavior, which is the proper course of action under Centerville's sexual harassment policy. Docket 41-14 at 2. Through their actions Ostrem and Baker not only created a policy condoning sexual harassment of Kopman, but they also established a pattern and practice that Centerville's sexual harassment policy could be disregarded.

 Ostrem was only a councilperson during part of the relevant time period. In April of 2009, Ostrem became Centerville's mayor. As mayor, Ostrem had the power to present any issues regarding Kopman's performance to the Council and to call special Council sessions.

Additionally, Ostrem, who has 30 years of law enforcement experience, worked at the Turner County sheriff's office as an investigator. Ostrem supervised Kopman's work as chief of police. In addition to her formal police department reports to the Council, Kopman also made frequent informal reports regarding her work to Ostrem. Ostrem asked Kopman to visit him at his home to discuss business matters. Given his position with Centerville and the Turner County sheriff's office. Kopman had no choice but to comply with Ostrem's requests. While she was at Ostrem's home on business matters, Ostrem sexually harassed her.

Ostrem impliedly threatened to fire Kopman if she complained about his behavior. Ostrem used his office as a councilperson and then as mayor to create, through his actions, a policy of instigating and tolerating sexual harassment toward Kopman.

Ostrem and Baker, who served in executive offices, consciously chose to sexually harass Kopman, whom they supervised, and their actions were not subject to meaningful review. Through their actions, they created a policy not only allowing sexual harassment of Kopman but also disregarding Centerville's sexual harassment policy. Thus, defendants' motion for summary judgment is denied on Kopman's hostile work environment claim against Ostrem in his official capacity and against Centerville.

**B.      State-Law Claim**

Kopman alleges a hostile work environment claim against Ostrem and Centerville under SDCL 20-13-10. The South Dakota Supreme Court has adopted the same standards as those set forth in Title VII cases for proving a hostile work environment claim. *Leslie v. Hy-Vee Foods, Inc.*, 679 N.W.2d 785, 791 (S.D. 2004). Regarding Kopman's state-law hostile work environment claim against Ostrem, defendants' motion for summary judgment is denied on that claim for the reasons stated above on Ostrem's § 1983 individual liability.

Regarding Centerville's liability for Ostrem's and Baker's conduct, the South Dakota Supreme Court has adopted the Eighth Circuit's test for

determining an employer's liability for sexual harassment. *Huck v. McCain Foods*, 479 N.W.2d 167, 169 (S.D. 1991) (adopting *Hall v. Gus Const. Co.*, 842 F.2d 1010, 1014-16 (8th Cir. 1988)). "An employer is vicariously liable for a supervisor's actionable sexual or racial harassment of employees unless the employer can establish the *Ellerth–Faragher* affirmative defense." *Crawford v. BNSF Ry. Co.*, 665 F.3d 978, 984 (8th Cir. 2012) (citing *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1195 (8th Cir. 2006)). Centerville does not allege a *Ellerth-Faragher* defense.[7] Docket 42 at 10 ("Kopman's discussion of the *Ellerth/Faragher* defense . . . likewise misses the mark. The City has not claimed this defense.").

Because Ostrem and Baker were Kopman's supervisors and Centerville does not allege the *Ellerth/Faragher* affirmative defense, it is vicariously liable for their conduct. Accordingly, defendants' motion for summary judgment is denied on Kopman's state-law hostile work environment claim against Centerville.

---

[7] Under the *Ellerth–Faragher* defense, an employer "may avoid vicarious liability for a supervisory employee's harassment if it satisfies " 'two necessary elements: (a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior[ ] and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.' " *E.E.O.C. v. CRST Van Expedited, Inc.*, 670 F.3d 897, 923 (8th Cir. 2012) (quoting *Weger v. City of Ladue*, 500 F.3d 710, 718 (8th Cir. 2007)).

## II.    Retaliation Claims

Kopman alleges a § 1983 retaliation claim against Ostrem in his individual and official capacities and against Centerville. She also alleges that Ostrem and Centerville violated SDCL 20-13-10. The analytical framework for a Title VII retaliation claim is utilized for a § 1983 retaliation claim. *Tyler v. Univ. of Ark. Bd. of Tr.*, 628 F.3d 980, 986 (8th Cir. 2011).

A plaintiff may meet her evidentiary burden for a retaliation claim through either direct or indirect evidence of retaliation. *Jackson v. United Parcel Serv., Inc.*, 548 F.3d 1137, 1142 (8th Cir. 2008). Kopman only offers indirect evidence of retaliation.

A retaliation claim based on indirect evidence uses the *McDonnell Douglas* burden-shifting analysis, under which Kopman bears the initial burden to prove a three-part prima facie case: "(1) she engaged in statutorily protected activity; (2) that the employer took an adverse employment action against her[;] and (3) that the two situations are causally connected." *Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 878 (8th Cir. 2005) (citations omitted). Once Kopman meets her burden, the burden then shifts to defendants to show there was a legitimate, nondiscriminatory reason for the adverse employment action. *Barker v. Mo. Dep't of Corr.*, 513 F.3d 831, 834 (8th Cir. 2008) (citing *Clark v. Johanns*, 460 F.3d 1064, 1067 (8th Cir. 2006)). If defendants make this showing, the burden shifts back to Kopman to show that the proffered reason

35

is mere pretext for discrimination. *Id.* (citing *Clark v. Johanns*, 460 F.3d 1064, 1067 (8th Cir. 2006)).

### A.     Section 1983 Claims

#### 1.     Ostrem's Individual Capacity

Ostrem concedes that Kopman engaged in protected activity when she filed a sexual harassment complaint with the SDDHR on October 7, 2009. But Kopman engaged in protected activity earlier when she told Ostrem at least six times to cease his sexually harassing behavior. *See Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (reasoning that an employee engages "in the most basic form of protected activity" when she tells her supervisor "to stop his offensive conduct." (internal quotation and citation omitted)). By telling Ostrem to stop his behavior, Kopman also followed Centerville's policy for reporting sexual harassment. *See* Docket 41-14 at 1 ("Any employee who feels they have been discriminated against according to this policy should bring this concern to his/her supervisor or higher authority[.]").

After complaining directly to Ostrem, Kopman reported the sexual harassment to Kludt on September 2, 2009. Kludt, Centerville's financial officer, is responsible for Centerville's human resources needs. As a manager or supervisor for Centerville, Kludt had the responsibility to "immediately advise the mayor, council president or a council member" of Kopman's sexual harassment complaint. Docket 41-14 at 2. Kludt claims she took no action on

36

behalf of Kopman, but this is inconsistent with Centerville's policy. By following Centerville's sexual harassment policy, Kopman put defendants on notice of her sexual harassment claim against Ostrem and Baker. *See Weger v. City of Ladue*, 500 F.3d 710, 721 (8th Cir. 2007) (" 'When an employer has a clear and established policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established.' " (quoting *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003))).

Under the second element, an adverse employment action, defendants initially conceded that the September 18 letter was an adverse employment action but withdrew that position in their reply brief. Docket 42 at 11 n.7. Because defendants raised this challenge for the first time in their reply brief, Kopman has not had an opportunity to respond. Notwithstanding this change in position, a reasonable jury could find that the September 18 letter constituted an adverse employment action.

The September 18 letter in isolation is not an adverse employment action. *See Phillips v. Collings*, 256 F.3d 843, 848 (8th Cir. 2001) ("Proof of an adverse employment action requires a 'tangible change in duties or working conditions that constitute a material disadvantage.' " (quoting *Cossette v. Minn. Power & Light*, 188 F.3d 964, 972 (8th Cir. 1999))). But the letter was part of the pattern of retaliation against Kopman because the letter acted as a

catalyst for Ostrem's writing the September 22 letter and convening the September 30 special Council session where Kopman was suspended without pay, which is an adverse employment action. *See, e.g.*, *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002) ("A pattern of adverse actions that occur[s] just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement." (citations omitted)); *Ross v. Douglas Cnty., Neb.*, 234 F.3d 391, 395 (8th Cir. 2000) (reasoning that if facts, when combined, "show a pattern of systemic retaliation taken in response to" a protected activity, the employee has made a prima facie showing of retaliation (internal quotation omitted)); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) (reasoning that the facts, when viewed in their entirety, showed that defendants took adverse actions against the employee). Defendants do not contest that Kopman's suspension without pay and her termination are adverse employment actions. Thus, the second element is met.

Under the third element, Kopman "must show that the protected conduct was a 'determinative—not merely motivating—factor' in the employee's adverse employment decision." *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1148 (8th Cir. 2008) (quoting *Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046, 1053 (8th Cir. 2007)). An inference of a causal connection can be drawn from the timing of when the employee engaged in protected activity and when the adverse employment action(s) occurred.

*Peterson v. Scott Cnty.*, 406 F.3d 515, 524 (8th Cir. 2005); *see also Reich v. Hoy Shoe Co.*, 32 F.3d 361, 365 n.4 (8th Cir. 1994) ("[A] showing that the adverse employment action so closely followed the protected activity in time could justify an inference of retaliatory motive." (citing *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1089 (8th Cir. 1992))). A temporal proximity of weeks is sufficient to sustain an inference of a retaliatory motive. *Smith*, 302 F.3d at 833 (citing *Sprenger v. Fed. Home Loan Bank*, 253 F.3d 1106, 1113-14 (8th Cir. 2001)).

Kopman told Ostrem at least six times to cease his sexual harassment. Ostrem did not stop his behavior and, one time, told Kopman to grow thicker skin. Because Kopman complained directly to Ostrem, her supervisor, about the conduct, he had actual notice of her sexual harassment complaints. *Ogden*, 214 F.3d at 1007. Moreover, Kopman's complaint to Kludt on September 2, 2009, put Ostrem on notice of Kopman's sexual harassment complaint. *Weger*, 500 F.3d at 721. Sixteen days later, on September 18, 2009, Ostrem wrote a letter to Kopman outlining her performance deficiencies.

Before the September 18 letter, Ostrem had never complained about Kopman's work. Instead, Ostrem had always complimented Kopman on her performance, especially her willingness to respond to calls. Kopman recalled receiving praise from Ostrem during the summer of 2009.

After Kopman requested and received a grievance hearing set for October 5, 2009, to contest the September 18 letter, Ostrem called a special session for the Council on September 30.

The Council held the September 30 special session even though Kopman informed Brewers that she would not be able to attend. Ostrem reported alleged concerns from Nogelmeier and Baldwin (neither attended any Council meeting) about Kopman's call coverage. Before the September 30 meeting, Ostrem approached Landeen-Hoeke to discuss Kopman's performance. Only after her discussion with Ostrem did Landeen-Hoeke express any concerns with Kopman's performance. Landeen-Hoeke addressed the Council with her concerns on September 30. Ostrem also reported concerns from Dawn Murra; Murra never addressed the Council personally. After hearing the evidence presented by Ostrem, the Council decided, on a 5-0 vote, to suspend Kopman without pay until the October 5 grievance meeting.

Kopman did not attend the October 5 grievance hearing because her attorney was unable to attend. Brewers granted Kopman a continuance until October 19. Kopman notified Brewers that she was unable to attend the October 19 meeting because her attorney was not available and Brewers rescheduled the meeting to November 2. Even though Kopman was unable to attend the October 19 meeting, the Council listened to complaints from two residents. No one investigated the residents' complaints or attempted to

40

substantiate their concerns. At the end of the October 19 meeting, Ostrem offered Kopman's charge of discrimination filed with the SDDHR to the Council. The Council continued her suspension without pay.

Kopman did not attend the November 2 meeting. On November 2, the Council voted to terminate Kopman. Ostrem then withdrew Kopman's appointment as chief of police.

Kopman has met her burden to show a causal connection because Ostrem took his first adverse employment action in the pattern of retaliation against Kopman, the September 18 letter, 16 days after she complained about his behavior to Kludt. Ostrem then called the September 30 special session, even though Brewers had scheduled the grievance hearing for October 5. Ostrem presented the majority of evidence at the September 30 meeting. Ostrem also sought out a statement from Landeen-Hoeke about Kopman's performance. Kopman has made a prima facie case of retaliation against Ostrem and the burden now shifts to Ostrem to show a legitimate reason for his actions.

Ostrem argues that the Council had a legitimate non-retaliatory reason for suspending and then terminating Kopman's employment because the Council found seven issues with Kopman's employment, as stated in her termination letter. Docket 28 at 16-19. This is a legitimate reason and, therefore, Kopman must now show pretext.

To show pretext, Kopman must allege " 'more substantial evidence [than it takes to make a prima facie case], . . . because unlike evidence establishing a prima face case, evidence of pretext . . . [and retaliation] is viewed in light of the employer's justification.' " *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (alterations in original) (citing *Smith*, 302 F.3d at 854).

Kopman offers facts to dispute all seven reasons offered by the Council for her discharge, *see* Docket 36 at 17-20, which creates genuine issues of material fact on whether her suspension and termination were proper. "A plaintiff may show that the employer's stated reason is pretext for discrimination by showing 'that the employer's proffered explanation is unworthy of credence because it has no basis in fact.' " *Amini v. City of Minneapolis*, 643 F.3d 1068, 1075 (8th Cir. 2011) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047-48 (8th Cir. 2011)). Kopman also argues that the Council did not complete a fair and impartial investigation into her allegations, even though Centerville's policies require an impartial investigation into sexual harassment,[8] because Ostrem investigated his own conduct. This can hardly be described as an impartial investigation. The failure to follow an employer's policy can also be sufficient basis for finding pretext. *See Dixon v. Pulaski Cnty. Special Sch. Dist.*, 578 F.3d 862, 871 (8th

---

[8] "The municipality will make a thorough, confidential, and impartial investigation of the complaint." Docket 41-14 at 2.

Cir. 2009) (recognizing that in some circumstances "an employer's violation of its own policies may be indicative of pretext." (*abrogated on other grounds* by *Torgerson*, 643 F.3d at 1043)).

Kopman further offers a November 14, 2009, conversation between herself, Austin, and Parmley, where Austin told Kopman that Ostrem admitted to continuing a "witch hunt" against Kopman. These facts, when viewed in their totality, could support a jury finding that the legitimate reasons offered by Ostrem are pretext for discrimination.

Kopman has met her burden to prove a retaliation claim and, therefore, Ostrem must now show that a reasonable mayor[9] would have believed that his actions were lawful in light of clearly established law. Ostrem, citing pages 97 and 98 of Kopman's deposition, contends that Kopman admitted that she has no evidence that he knew of her September 2 complaint when he wrote the September 18 letter. Defendants, however, did not provide page 98 of Kopman's deposition and the court is unable to review Kopman's response to the question, "Are you aware of any evidence that anyone on the Council, Mayor Ostrem, or City Attorney Brewers knew of your sexual harassment claim before the September 30th deposition to suspend your employment?" Docket 31-1 at 14.

---

[9] Because the events applicable to Kopman's retaliation claim occurred while Ostrem was mayor, he must show that a reasonable mayor would have believed that his actions were lawful.

43

Kopman's answer to this question is irrelevant. As stated earlier, by complaining to Kludt, Kopman put defendants on notice of her sexual harassment complaint. Moreover, short of serving Ostrem directly with her SDDHR complaint, Kopman took all reasonable steps to convey to Ostrem her opposition to his offensive comments by telling him directly to stop making the comments, which is protected activity. Ostrem presented Kopman's SDDHR charge to the Council on October 19 but continued to allow evidence to be presented against Kopman, which ultimately led to her termination on November 2.

Ostrem also argues that he is not liable under the cat's paw theory. Docket 42 at 21 (citing *Qamhiyah v. Iowa State Univ. of Science & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009)). The cat's paw theory, however, is inapplicable. *See Qamhiyah*, 566 F.3d at 742 (" 'This circuit's cat's paw rule provides that an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person or committee as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design.' " (quoting *Richardson v. Sugg*, 448 F.3d 1046, 1060 (8th Cir. 2006))); *see also Staub v. Proctor Hosp.*, 131 S. Ct. 1186 (2011) (reasoning that the cat's paw theory applies to an employer's liability).

Because Ostrem has not shown that a reasonable mayor would have believed that his actions were lawful, defendants' motion for summary judgment on Kopman's claim of retaliation against Ostrem in his individual capacity is denied.

### 2.   Ostrem in His Official Capacity and Centerville

As a policymaker, Ostrem's acts may fairly be said to represent official policy when he wrote the September 18 letter and then distributed the letter to Kopman and the councilpersons. He also called the September 30 special meeting, even though Kopman's grievance hearing was scheduled for October 5, at which time Ostrem could have presented any concerns he had with Kopman's performance. Ostrem acted under his authority as mayor in calling the special session, which furthered a pattern of retaliation. Thus, defendants' motion for summary judgment is denied as to Ostrem's official capacity liability and Centerville's liability for Kopman's § 1983 retaliation claim.

### B.   State-Law Claims

Kopman also alleges violations of South Dakota law for retaliation against Ostrem and Centerville. South Dakota employs the same test for retaliation as that stated above for a § 1983 claim. *Williams v. S.D. Dep't of Agric.*, 779 N.W.2d 397, 402 (S.D. 2010); *Lord v. Hy-Vee Food Stores*, 720 N.W.2d 443, 450 (S.D. 2006). For the reasons stated under the § 1983 claim's

analysis, summary judgment is denied on Kopman's state-law retaliation claim against Ostrem.

Because Centerville has not alleged the *Ellerth–Faragher* affirmative defense, defendants' motion for summary judgment is denied on Kopman's state-law retaliation claim.

## III.   Punitive Damages

Kopman generally seeks punitive damages from defendants. But in her brief opposing summary judgment, Kopman acknowledges that punitive damages are not available against Centerville under § 1983. Because a claim against Ostrem in his official capacity is the same as a claim against Centerville, punitive damages are also not available against Ostrem in his official capacity. *See Graham*, 473 U.S. at 165-66 (reasoning that a § 1983 suit against a government official sued in his official capacity is a suit against the government entity); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 268-69 (1981) (holding that punitive damages are not available against a municipality); *see also Riggs v. City of Owensville*, No. 4-10-CV-793, 2010 WL 2681384, at *2 (E.D. Mo. July 2, 2010) (collecting district court cases that have held that punitive damages are not available against a municipal public official sued in his official capacity). Thus, defendants' motion for summary judgment is granted on Kopman's request for punitive damages on the § 1983 claims against Centerville and Ostrem in his official capacity.

46

Regarding Kopman's punitive damages claim against Ostrem in his individual capacity, "[p]unitive damages may be awarded under 42 U.S.C. § 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.' " *Schaub v. VonWald*, 638 F.3d 905, 922 (8th Cir. 2011) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). This is a factual question. *Id.* at 923 (citing *Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir. 1997)).

 Ostrem offers no argument on how he is not liable for punitive damages other than that Kopman has not alleged sufficient facts to make out her sexual harassment claims. As stated above, however, summary judgment is denied on Kopman's § 1983 claims against Ostrem in his individual capacity.

Enough facts exist in the record that a jury could determine that Ostrem acted with an evil motive, including that Ostrem told Austin he was on a "witch hunt" for Kopman, telling the Council "you don't f*** the help," and laughing to the Council about his ability to smear Kopman's name in the media, which, according to Kopman, prevented her from subsequently securing a job in South Dakota. Accordingly, summary judgment is denied on Kopman's punitive damages request against Ostrem in his individual capacity on her § 1983 claims.

South Dakota allows punitive damages against a defendant "where the defendant has been guilty of oppression, fraud, or malice, actual or presumed[.]" SDCL 21-3-2. The plaintiff must show that the defendant acted with "either actual, malice in fact, or presumed, legal malice." *Dahl v. Sittner*, 474 N.W.2d 897, 900 (S.D. 1991). "Actual malice is a positive state of mind, evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will towards that person." *Id.* (citation omitted). "Presumed, legal malice, on the other hand, is malice which the law infers from or imputes to certain acts." *Id.* (citing *Hannahs v. Noah*, 158 N.W.2d 678, 682 (S.D. 1968)). An inference of presumed malice may be made when the person acts willfully or wantonly and injures another. *Id.*

The same facts that could support a punitive damages award for the § 1983 claims could also support a jury's finding of malice by Ostrem against Kopman. Thus, defendants' motion for summary judgment is denied on Kopman's punitive damages claims against Ostrem for the state-law claims.

Centerville argues that it cannot be liable for punitive damages on Kopman's state-law claims. Neither SDCL 21-3-2 nor any other South Dakota statute prohibits punitive damages against a municipality. It appears that the South Dakota Supreme Court has not directly addressed the question of whether a municipality is liable for punitive damages in this situation. *See, e.g.*, *City of Mitchell v. Beauregard*, 430 N.W.2d 704, 705 (S.D. 1988) (declining

to determine whether the trial court's determination that punitive damages were not available against a municipal corporation was correct).

Kopman, citing *City of Fort Pierre v. United Fire and Casualty Co.*, 463 N.W.2d 845 (S.D. 1990), argues that Centerville can be liable for punitive damages. In *City of Fort Pierre*, the South Dakota Supreme Court held that an insurance company did not have to pay a civil penalty when a city intentionally created a road that violated the Clean Water Act. *Id.* at 848-49. *City of Fort Pierre* does not hold that a municipality can be held liable for punitive damages. It appears that whether a municipality is liable for punitive damages for a sexual harassment complaint is an issue of first impression. "When a state's highest court has not addressed the precise question of state law that is at issue, a federal court must decide what the highest state court would probably hold were it called upon to decide the issue." *Lenhardt v. Basic Inst. of Tech., Inc.*, 55 F.3d 377, 379 (8th Cir. 1995) (quotation omitted).

The South Dakota legislature, in passing SDCL 23-13-10, relied on Title VII federal law. *See* SDCL 20-13-10, advisory committee notes on sex discrimination in employment (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999)). In interpreting SDCL 23-13-10, the South Dakota Supreme Court has relied on and adopted federal law on Title VII. *See, e.g.*, *Huck*, 479 N.W.2d at 170 (adopting Title VII's scheme for holding an employer liable under South Dakota's anti-discrimination laws). Thus, the court finds that the South

Dakota Supreme Court would look to federal Title VII law in determining whether punitive damages are available against Centerville.

Title VII's damages provisions expressly prohibit punitive damages against "a government, government agency or political subdivision[.]" 42 U.S.C. § 1981a(b)(1); *see also Spinks v. City of St. Louis Water Div.*, 176 F.R.D. 572, 574 (E.D. Mo. 1997) ("It is clear that punitive damages are not available against a municipality under Title VII." (citations omitted)).

The South Dakota Supreme Court would likely find that Centerville cannot be liable for punitive damages under SDCL 23-13-10. Thus, defendants' summary judgment is granted on Kopman's punitive damages claim against Centerville for her state-law causes of action.

## CONCLUSION

Defendants move for summary judgment on all of Kopman's claims and her punitive damages request. Summary judgment is denied on Kopman's § 1983 claim for a hostile work environment against Centerville and Ostrem in his individual and official capacities. Summary judgment is denied on Kopman's state-law claim of a hostile work environment against both defendants. Summary judgment is denied on Kopman § 1983 claim for retaliation against Ostrem in his individual and official capacities and denied against Centerville. Summary judgment is also denied on Kopman's state-law claim for retaliation against both defendants. Summary judgment is denied on

50

Ostrem's liability for punitive damages for the § 1983 claim in his individual capacity but granted on Kopman's punitive damages claims against Ostrem in his official capacity and against Centerville. Summary judgment is denied on Kopman's state-law claims for punitive damages against Ostrem and granted against Centerville. Accordingly, it is

ORDERED that defendants' motion for summary judgment (Docket 27) is granted in part and denied in part.

Dated May 11, 2012.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

51